UNITED STATES *v.* FIBRE MAKING PROCESSES, INC. (No. 4515)[1]

[1] C. A. D. 323.

United States Court of Customs and Patent Appeals, January 7, 1946

*Paul P. Rao*, Assistant Attorney General (*Sybil Phillips* and *Richard F. Weeks*, special attorneys, of counsel), for the United States.
No appearance for appellee.

[Oral argument December 4, 1945, by Mr. Weeks]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

BLAND, Judge, delivered the opinion of the court:

In 1938 appellee imported an article concededly in chief value of metal, invoiced as "one case Spiral Heat Exchanger" and which was to be used in connection with a pulp making machine by the Wood Conservation Co. in Cloquet, Minn. It was assessed for duty by the collector at 45 per centum ad valorem under paragraph 397 of the Tariff Act of 1930 as a manufacture of metal and was in the protest by appellee claimed to be dutiable at 20 per centum ad valorem under paragraph 372 of said act as modified by the trade agreement with Sweden, T. D. 47785, as parts of "machines for making paper pulp or paper, not specially provided for."

The United States Customs Court, Second Division, sustained the importer's protest and held the merchandise dutiable as claimed (C. D. 920). In the opinion of the court one judge concurred in the conclusion of the writer of the opinion and the third judge dissented. The Government has here appealed from the judgment of said court.

At the trial of the instant proceeding the record in a former proceeding, Protest 10590–K, *American Heat Reclaiming Corporation* v. *United States*, C. D. 608, was incorporated into the instant record. In each of the records there is the testimony of but one witness, Claes Emil Creutz, vice president and general manager of the American Heat Reclaiming Corporation, for whom The Fibre Making Processes, Inc., appellee, was a representative. He was well qualified.

There is some dispute as to the effect to be given the testimony of this witness relating to the character and workings of the imported device. We will not quote extensively from the testimony since upon a consideration of the records as a whole the function and mode of operation of the device is shown to be very simple as compared with the very much involved subject matter presented in oral argument.

The imported spiral heat exchanger here involved is shown by the record to be for the sole purpose of use in a pulp making plant, as were others of the same kind imported by the same company. The record shows, however, that heat exchangers like that involved here are used in a number of different industries, all being the same in operation and construction though perhaps some of them differ from

the instant one only in the manner of connecting them to the machines with which used and possibly in other immaterial respects. The proof is clear, however, that this particular kind of heat exchanger "has been applied in almost all chemical industries, principally, however, in the pulp industry and sugar industry, and by some in the sulphuric acid industry."

The device is what its name indicates—one which exchanges heat which would otherwise be wasted and reuses it in another or a continuing operation. In the pulp making industry a large container called a digester is used and chips of wood, together with water and certain acids, are placed in this digester and submitted to intense heat and pressure until the wood has been pulped or digested. Heat exchangers of this type are used to conserve the heat and reuse the same in many instances where great heat is applied to liquids being treated, such as sugar, sirup, chemicals, etc. The exchanger is so constructed that the heat from the hot liquid as it is being withdrawn from the system or recirculated through the same is transferred. through the use of spiral plates, to liquid coming into the system.

One of the apparent differences of opinion between the judges of the tribunal below seems to root from what we regard as an erroneous conclusion of fact drawn from the instant record. The witness stated that these exchangers were used to conserve heat in the manner above indicated in various industries and that this was accomplished by circulating the liquid through the heat exchanger, which operated to heat, or partially heat, the incoming new water or material. The testimony of the witness makes it clear to us, although he did not say so in so many words, that the exchanger served in the nature of an auxiliary heating apparatus although no heat was engendered therein but was there merely transferred.

The witness stated at one place, and the majority of the trial court seemed to give this testimony controlling influence, that one could not make pulp without the use of heat exchangers and that they were an essential, integral part of pulp making machines and that the instant importation was imported expressly for and designed for use in a pulp making machine. This testimony, however, followed the witness' explanation as to the function and purpose of this and like heat exchangers in a pulp making plant and elsewhere, and, furthermore, his answer in this respect was elicited by the question, "Can you practically, or practicably, make pulp without the use of this heat exchanger, or is it an essential, integral part of pulp making machines?" It will be noted that the question contains the words, "practically or practicably." The witness stated that these spiral heat exchangers can be used interchangeably in different industries.

In the light of the nature of the article and from that which the court may take judicial notice (and no one denies this fact) such an exchanger may be a valuable adjunct to a pulp making machine or a sugar making machine or any kind of a machine which operates upon a liquid with intense heat, but there is nothing in the record that disputes the obvious conclusion that if one wished to use sufficient fuel to produce the desired heat without the exchanger a pulp making machine could operate without an exchanger. This fact seems too obvious to admit of any plausible contradiction. (See "Paper Manufacture" and "Paper Materials," *Encyclopaedia Britannica*, vol. 17, page 230, *et seq.*)

No doubt one who would operate a pulp making machine without a heat exchanger would, as a practical matter, be handicapped in competition with those more efficiently organized plants which conserve their heat by using heat transferring adjuncts.

There is nothing in the record which shows the chief use of this kind of heat exchanger to be in any one particular industry. The witness stated that it was principally used in the pulp and sugar industry. That fact, for the most part, induced the dissenting opinion. It was the position of the majority, at least that of the writer of the opinion, that since the record showed, as he interpreted it, that the imported article was an essential, integral part of a pulp making machine, which as a pulp making machine could not function without it, it therefore was necessarily a part of said machine, regardless of its chief use.

In view of our conclusion, for the reasons hereinbefore stated, that upon the instant record the imported spiral heat exchanger is not to be regarded as an integral, component part of a pulp or paper making machine, we think this completely decides all questions which we should discuss or pass upon here and that a discussion or holding as to the effect of the doctrine of chief use would be *obiter* and unnecessary to our decision of the controlling issue here presented. In *United States* v. *Willoughby Camera Stores, Inc.*, 21 C. C. P. A. (Customs) 322, T. D. 46851, we said:

> The court below held that the involved tripods were chiefly used as parts of cameras, and, therefore, dutiable as such parts. Of course, if they are parts of cameras *and chiefly so used*, the judgment must be affirmed. *Magone* v. *Wiederer*, 159 U. S. 555. However, if they are not parts of cameras, the fact that they are chiefly used in connection with, and as supports for, cameras, is, obviously, not of vital importance in a proper determination of the issues before us. [Italics not quoted.]

The sentence above quoted, "of course, if they are parts of cameras and chiefly so used, the judgment must be affirmed," was interpreted by the dissenting judge to mean that in any event for an article to be a part of a thing it must be chiefly used in connection with it. The

first part of the sentence is the important part, because if the tripods were "parts of cameras" that ended it and the fact that they were or were not chiefly used with cameras would not change the situation. This thought is made clear in the cited *Magone* v. *Wiederer* case if the latter part of the quotation from said decision relied upon by the dissenting opinion is carefully read. In that case it was pointed out by the Supreme Court in effect that if the pieces of glass cut into shape could *just as well be used in connection with things other than clocks and had several uses to which they were perfectly applicable they would not be parts of clocks.*

But since we hold, as we have hereinbefore, that the instant importation is not a part of a pulp or paper making machine, under well settled rules, it is unnecessary for us to further discuss either of the above referred to cases.

It is, under the peculiar circumstances of the case, proper to say that the trial court, having arrived at the conclusion erroneously that the record showed that the exchanger was part of the machine, properly concluded that the question of chief use was not a controlling one.

We are of the opinion, for the reasons stated, that the majority of the trial court arrived at the wrong conclusion in respects above stated and that it should have overruled the protest, and its judgment sustaining the same is *reversed.*